[Crim. No. 7345. Second Dist., Div. One. May 22, 1961.]

THE PEOPLE, Respondent, v. JOHN GARDNER, Appellant.

358

Earl C. Broady for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and David R. Cadwell, Deputy Attorney General, for Respondent.

WOOD, P. J.—Defendants John Gardner and Alma Maxey were accused of violating section 11501 of the Health and Safety Code in that they unlawfully sold opium. In a nonjury trial they were convicted. Probation was denied as to Gardner and he was sentenced to imprisonment in the state prison. Probation was granted as to Maxey. Defendant Gardner appeals from the judgment and the order denying his motion for a new trial.

The minutes show that at the beginning of the trial the People made a motion for permission to read into evidence the testimony of Fred Berry, as contained in the preliminary-examination transcript, on the ground that the People could

not produce the witness. The defendants opposed the motion and objected to the offer of such testimony. The trial judge found that the People had exercised due diligence in attempting to produce Berry as a witness. The motion was granted.

By stipulation the cause was submitted on the testimony as shown by the transcript of the preliminary examination, subject to the right to offer additional evidence, and without prejudice to defendant's objection to the preliminary-examination testimony of Fred Berry being read at the trial.

Prior to the filing of the present information against Gardner and Maxey, an information had been filed against Gardner charging him with unlawfully selling narcotics, and an information had been filed against Maxey charging her with unlawfully selling narcotics. The People made a motion to consolidate the two prior cases for trial. The defendants objected to the consolidation. The motion to consolidate was denied. Thereupon the People made a motion to dismiss the informations. Defendants opposed the motion to dismiss on the ground that the defendants were ready for trial and that defendants would be prejudiced by the delay and that the dismissal of the informations and filing of another information would constitute a denial of their right to a speedy trial. The motion to dismiss was granted.

At the beginning of the present trial, defendant Gardner made a motion to dismiss the information on the ground that he had been denied his right to a speedy trial and had been denied due process of law in that the former information against him had been dismissed. The motion was denied.

Appellant (Gardner) contends on appeal that the court erred: (1) in denying his motion to dismiss the present information; (2) in finding that the People had exercised due diligence in attempting to produce Fred Berry as a witness; (3) in overruling appellant's objection to the reading of the preliminary-examination testimony of Fred Berry.

Fred Berry's testimony, as shown by the transcript of the preliminary examination, was in substance as follows: On January 18, 1959, he told Alma Maxey that while he was in the county jail he had talked with "Champ" (her husband) who was in the jail, and that Champ wanted him to go to John Gardner (defendant) to see if $1,500 could be raised for Champ's bail. He (Berry) talked with her on that day about purchasing cocaine from Gardner in order to raise the bail.

On January 19 he talked with Maxey by telephone and she told him to meet her the next morning. Then he told officers about the plan to meet Maxey, and he agreed to meet the officers at 52d and Cimarron Streets on January 20 before he went to Maxey's apartment. On January 20 he met the officers at that place, where they searched him and his car. Then he drove his car to an apartment house at 62d and Hoover Streets where Maxey resided, and while he was driving there the officers followed in their car and kept him under surveillance. He went into her apartment, and after a few minutes he and she entered his car and went to a place on 115th Street which was about a block from appellant's drugstore at Wilmington and Imperial Boulevards. She told Berry to park on 115th Street—that Gardner knew that she was getting opium for Berry but he (Gardner) did not want to see her give it to Berry. After parking the car, they walked to the corner of Wilmington and Imperial and she entered appellant's drugstore, and he entered a nearby liquor store. Within approximately five minutes they came out of the stores and proceeded toward his car. She said she would drive the car onto Wilmington Boulevard, and that he should walk to Grandee Street and Imperial Boulevard (other end of the block) and she would meet him there. She drove his car and turned onto Wilmington and out of his view. While he was walking, as directed by her, he met Officer Gilkey and had a conversation with him. Later she drove the car to Grandee and Imperial and he entered the car and proceeded toward her home. He asked her if she got the stuff, and she replied that she got it and would give it to him when they arrived home. She also used the word "opium" in referring to the substance in the bottle. When they arrived at 62d and Hoover (where her apartment was located) she reached under the car seat and handed him a paper sack in which there was a bottle. Berry put the sack on the car seat. She got out of the car and started toward her apartment. He drove to 58th and Vermont Streets where he met the officers and told them that the "stuff" was on the seat. One of the officers took the bottle. Berry told them what had occurred.

Officer Gilkey testified as follows: He was one of the investigating officers, and in the investigation the officers used an operator by the name of Fred Berry. On January 20, 1959, he (witness) was present at 52d and Cimarron Streets when an officer searched Berry and his car. No narcotic was found in that search. Then the officers followed Berry to the vicinity

of 68th and Hoover Streets, where Berry got out of his automobile and walked away. Later Berry and Maxey entered Berry's car and went to 115th Street near Imperial and Wilmington. Then they left the car and walked toward Wilmington where Berry went into a liquor store and Maxey walked toward Imperial. Later they returned to the car on 115th Street and Maxey entered the car, and Berry walked to Grandee Street where the officer (witness) had a conversation with him. Then the witness returned to the other officers who were in their parked car near Imperial and Wilmington. At that time Berry's car was parked on Wilmington in front of the drugstore, and Maxey was sitting at the steering wheel. Appellant left the drugstore, went to the driver's side of the car and then to the other side and entered the car. Appellant remained in the car five or ten minutes, and then he returned to the drugstore. Maxey drove the car to Grandee where Berry entered the car, and they returned to a place near Maxey's apartment and she got out of the car. Berry then drove the car to a place near Vermont Avenue where he met the officers. At that time a paper bag with a bottle in it was on the car seat. Each officer placed his initials on the bag. The bottle was given to Officer Richards. Exhibit 1 appears to be the same bottle that was in the bag.

Berry testified further that on January 22 he returned to appellant's drugstore and told appellant that the stuff he had gotten from appellant was not too good and that opium was difficult to dispose of, and that if appellant could get an ounce of cocaine for Berry he would be able to raise the thousand dollars; appellant replied that it was difficult to procure that much cocaine for the drugstore, and that he was checked by narcotics agents; appellant said he would see what he could do about securing cocaine for Berry; then Berry gave appellant $150; appellant asked if he wanted a receipt, and Berry replied that was not necessary.

Officer Gilkey testified further as follows: On January 22, after the witness and other officers had searched Berry and removed his money, they gave him $150 of "Government advance funds." Then Berry went with them in their car to a place near Imperial and Wilmington. Then Berry left the car and entered the drugstore at the corner. After staying five or ten minutes in the store, he returned to the officers. They searched him, but he did not have any money.

Officer Chambers, who was qualified as an expert in fingerprint identification, testified that he was assigned to the finger-

print section of the sheriff's laboratory; he made fingerprints of appellant's fingers; he also obtained fingerprints from Exhibit 1 (the bottle); in his opinion the fingerprint which was "lifted" from the bottle was the print of appellant's left thumb.

Mr. Crane, a chemist, testified that the contents of the bottle (Exhibit 1) were powdered opium.

Defendant Alma Maxey was also known as Alma Erwing. She testified in substance as follows: She had met Berry about four months prior to January, 1959. On January 18, 1959, he told her that he had seen her husband in the county jail and he had asked Berry to talk to her about raising bail. She told him that appellant was holding some money for bail. They went, in Berry's car, to appellant's drugstore where Berry and appellant had a conversation in which something was said about bail money. On January 20 when Berry called her by telephone she told him that she had received $50 from "Champ's" brother and she was going to give that to appellant as bail money. She and Berry went to the vicinity of appellant's drugstore, and Berry went into a liquor store and she went into the drugstore. Appellant said he was busy, and he asked her to wait in her car for him. After she left the store she told Berry that appellant was busy but he would come out to the car later. She told Berry to walk around the corner. Then she drove the car to the drugstore and waited for appellant. A few minutes later, appellant came out and she gave him $50. Then she drove around the corner, "picked up" Berry, and they returned to her apartment. She did not talk with appellant about narcotics.

Mrs. Woriell, an employee of a bonding company, who was called as a witness by appellant, testified that on February 2, 1959, appellant gave her $150 to apply as premium on a bail bond.

Mr. Richards, called as a witness by appellant, testified that when he was a federal narcotics agent in the first part of 1959 he inspected the requisitions for narcotics which came from appellant's drugstore, and he did not see any requisition for the type of opium which is involved in this case; the bottle herein (Exhibit 1) appears to be a container that is used by wholesale drug houses for packaging opium.

Appellant testified in substance as follows: He is a pharmacist and owner of a pharmacy at 1901 Imperial Highway. The bottle (Exhibit 1) is the type of container used by wholesale houses in packaging opium. He never purchased any opium

of that type from a wholesale house. Exhibit 1 never came into his possession. About January 18, 1959, a bottle similar to Exhibit 1 was handed to appellant by Berry, who said that he was trying to raise bail for Champ and he was going to dispose of the bottle, and he asked appellant if he would keep it until he returned. Appellant replied that he could not do that. When appellant took the bottle "in his hands," he did not know what it was. After appellant looked at the bottle, he recognized what it was, and then he handed it back to Berry. Maxey introduced Berry to appellant on January 18, and on that occasion (prior to handing the bottle to appellant) Berry asked appellant to help raise bail for Champ. Maxey and others had some problems "with losing some of the money people were giving for bail," and appellant was asked to hold the money as depositary. At one time he had approximately $950 in his possession for that purpose. When Berry was in the store on that occasion, four employees of appellant were in the store. Mr. McChristian and Miss Jones, two of the employees, were in court as defense witnesses on January 4, 1960, when the case was called for trial upon the prior information (when that information was dismissed); but since that time he has not seen them and has not been able to locate them. On January 20, 1959, Maxey returned to appellant's store, and he told her that he was busy but he would talk to her if she would wait in the car. After a few minutes, he went to the car and she gave him $50 to add to the bail money. He did not have any conversation with her, at any time, about illicit traffic in narcotics in order to get bail. He delivered the $50 to one Bates for the purpose of giving it to the bondsman. On January 22 Berry brought $150 to appellant "to apply to the bail." Berry did not tell appellant that some "stuff" appellant had given him was not good or he could not get much for it. Appellant delivered the $150 to Mrs. Woriell, the bail bond agent, Berry never said anything to appellant about cocaine. Appellant has never had opium in his store in a container that was similar to Exhibit 1.

As above stated, Berry was present at the preliminary examination and he was present on April 6, 1960, when the case was called for trial and when, upon appellant's motion, the case was continued to April 19, 1960, because appellant could not locate certain witnesses (McChristian and Jones). On April 19, upon motion of the People, the case was continued to April 26 because Berry was not present. When the People

made the motion on April 26 for permission to read the preliminary-examination testimony of Berry, two witnesses testified with reference to the search that had been made in trying to produce Berry as a witness.

Officer Farrington, a deputy sheriff, testified in substance as follows: He knew the witness, Fred Berry, and he had made a search for him. He checked the Los Angeles County Hospital, the Los Angeles County Morgue, the Los Angeles City Jail, the Los Angeles County Jail, but did not receive information as to where Berry could be located. He (witness) checked the "Register of Voters" and found that Berry was not registered. He checked the Los Angeles County Property Tax Office and found that there was no listing for Berry. He and Officer Landry checked the Long Beach and San Pedro areas which Berry "was known to frequent." They checked the Paradise Room, Marine Room, the Reef, Jimmy's, and the Royal Palm, which are bars in the Long Beach-San Pedro area. They checked the Los Angeles area which included the Rubaiyat Room, the Intermission, and various bars "known to be frequented" by Berry. They contacted Berry's wife, V. V. Berry, who said she had not seen him for approximately a month—that they had an altercation and officers were called. They checked his last known address, at 936¼ West 82d Street, which was an apartment that had been occupied by Berry and Clarisse Key. Several garments, cards, and addresses, and a copy of a bail bond, were found there. He (witness) called the Sparks Bonding Agency, which had written the bond, and he was informed that Doris Williams had secured a (furnished security for) bail bond "on" Berry. Jackie Sparks, a representative of that agency, said that Doris Williams had called the agency and had stated that she wanted "to get off the bond" of Berry because she wanted to sell her property which secured the bond and she could not do so while the "bond" was against her property. The "bonding company" did not know the whereabouts of Berry. While the officers were at Berry's last known address on 82d Street, a lady in another apartment said that Miss Resin was the real estate agent who represented Mr. Milton, the owner of that property. The officers went to the agent's office on Western Avenue but she was not there.

Officer Landry, a deputy sheriff, testified that he knew the witness, Fred Berry, and he had worked on several cases with Berry, in which cases Berry had testified on behalf of the People. In prior proceedings, and in this proceeding before

April 19, Berry had been present, at the request of Officer Landry, without having been subpoenaed. When Berry did not show up at the office (of Officer Landry) on April 19, prior to the calling of the case for trial, he (officer) went to Berry's address at 935¼ West 82d Street, but no one was there. Once or twice previously, the officer had brought Berry from that address to the court. After the continuance herein was granted on April 19, he (witness) and Officer Farrington made an extensive search of the Long Beach and San Pedro areas, in which areas he had seen Berry several times on previous occasions. They went to Berry's address on 82d Street, and a lady there, who seemed to be the caretaker, said that "the people" had left in a hurry. He made a search at the Southern California Gas Company and found that the gas service at the 82d Street address was under the name of John J. Mayes from the date "12-3-59." He also went to the Department of Water and Power and found that the service at that address was under the name of Fred Key. He also checked the superior court file in the criminal case pending against Berry to ascertain the names of persons whose names were listed as references in Berry's application for probation. He went to the persons whose names were so listed. He also went to the "King" bonding agency which wrote the bond for Berry, and King said that he had released his bond as to Berry, and he had not seen Berry for some time and did not know where he was. He (officer) went to see Mr. Ruby, who was a friend of Berry, and he said that he had not seen Berry for approximately a month and he did not know where he was. He went with Officer Farrington to the various places in the Long Beach and San Pedro areas which were referred to in the testimony of Officer Farrington.

Section 686 of the Penal Code provides: "In a criminal action the defendant is entitled: 1. . . . 2. . . . 3. . . . to be confronted with the witnesses against him, in the presence of the court, except that where the charge has been preliminarily examined before a committing magistrate and the testimony taken down by question and answer in the presence of the defendant, who has . . . cross-examined or had an opportunity to cross-examine the witness; . . . the deposition of such witness may be read, upon its being satisfactorily shown to the court that he . . . cannot with due diligence be found within the state; . . ."

[█] Appellant argues that the prosecution did not make a sufficient showing of due diligence in searching for the

missing witness. Some of appellant's specifications of lack of due diligence are: the search was confined to a few days before the trial (from April 19 to April 26) ; a subpoena was not issued; the officers sought information at bars and night clubs which were places from which the least information could be secured; they failed to seek information from his place of employment and from his relatives; they failed to seek information regarding a change of service by public utilities and regarding a forwarding address at the Post Office; and they failed to check a former telephone number and three former addresses of defendant.

There was evidence that Berry had previously cooperated with the officers and had appeared as a witness on former occasions without a subpoena having been served on him. The officers began a search for him on April 19, when they first learned that he failed to appear. They were informed by Berry's wife that she had not seen him for approximately a month. They found that he was not at his last known address where he lived with Clarisse Key. A person, who apparently was the caretaker there, said that ''the people'' left in a hurry. Mr. King, a representative of the bonding company which wrote a bail bond ''on Berry,'' said the bond had been released and he had not seen Berry for approximately a month. Mr. Ruby, a friend of Berry, said he had not seen him for approximately a month. From such information, the trial judge could reasonably infer that Berry had deliberately disappeared for the purpose of avoiding the service of process.

Also there was evidence that the bars and clubs which the officers searched were places which were ''known to be frequented'' by him. The officers did seek information from the gas company and the Department of Water and Power regarding service at his last known address. They also inquired at jails, the county hospital, office of Registrar of Voters, office of tax collector, and bail bond offices.

■ ''The question of what constitutes due diligence to secure the presence of a witness which will authorize the reading to the jury of testimony taken at the preliminary hearing of the case is largely within the discretion of the trial court, and depends upon the facts of each particular case. The decision of a trial judge on the question of diligence and of the propriety of receiving or rejecting the evidence will not be disturbed on appeal unless it appears that there was an abuse of discretion. [Citations.] The problem is primarily for the trial court, and its solution will not be disturbed if

there is evidence of substantial character to support its conclusion." (*People* v. *Cavazos*, 25 Cal.2d 198, 200-201 [153 P.2d 177] ; *People* v. *Thomas*, 164 Cal.App.2d 571, 576 [331 P.2d 82].)

The search in *People* v. *Glick*, 107 Cal.App.2d 78 [236 P.2d 586] was similar to the search in the present case, and it was held in the cited case that due diligence had been shown. In the Glick case it was said, at pages 80 and 81: "The record discloses that on January 4, 1951, a process server from the district attorney's office received a subpoena for Robert George Allen, the driver of the cab in which defendant was riding at the time of the incident above related. On January 20, 1951, the process server went to the offices of the Yellow Cab Company, who had been Mr. Allen's employer, and was informed he had left their employ on January 17, 1951; on the same day he went to Mr. Allen's place of residence and was informed that he had moved. The landlady told the process server Mr. Allen had left about two weeks before, that several people had been looking for him but she did not know where he was. The process server then went to the Registrar of Voters, whose records indicated he was not a registered voter. An inquiry was put through the post office department and the report was received that there was no record of him. The records of the county hospital were checked and it was found that no Robert George Allen was listed, and the records of the county and city jails also disclosed he had never been booked at either. A check of the retail credit association resulted in a showing he had no accounts with the large department stores in Los Angeles.

"On three different occasions the process server returned to the Yellow Cab Company only to learn that Mr. Allen had not returned to work. The same result was received upon questioning his former landlady. He also interviewed numerous cab drivers, none of whom knew where the witness could be located.

"The foregoing testimony is clearly ample to support the trial court's finding that there had been sufficient compliance with the requirements of section 686 (3) of the Penal Code to permit the introduction of the questioned testimony."

In the present case the evidence was sufficient to support the finding that due diligence had been exercised in trying to find the missing witness. The court did not err in permitting the prosecution to read, at the trial, the testimony of Berry which was given at the preliminary examination.

 A further contention of appellant is that the court erred in denying his motion to dismiss the present information. As above shown, the asserted basis for this contention is that the former separate informations were dismissed and the present information against both defendants was filed in lieu thereof with the alleged result that appellant had been denied a speedy trial and had been denied due process of law. Appellant states in his brief that this contention is submitted without argument because the records in the former cases are not before this court. It has been held that after an information has been dismissed by the prosecution another information against the same defendant for the same crime may be filed. (See *People* v. *Godlewski*, 22 Cal.2d 677, 683 [140 P.2d 381]; *People* v. *Prewitt*, 52 Cal.2d 330, 340 [341 P.2d 1].) In the present case the court did not err in denying appellant's motion to dismiss the information. Appellant was not denied due process of law or denied a speedy trial.

The evidence was sufficient to support the judgment.

The judgment and the order denying the motion for a new trial are affirmed.

Fourt, J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 19, 1961.